## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

VICTOR FUENTES, individually and :
on behalf of all others similarly situated, :
    PLAINTIFF, :    CIVIL ACTION
:    NO. 2:18-CV-5174
v. :
:
JIFFY LUBE INT'L, INC., :
    DEFENDANT. :

**May 28, 2024**                                 **Anita B. Brody, J.**

### MEMORANDUM

Plaintiff Victor Fuentes, on behalf of himself and the putative class members he seeks to represent, has negotiated and agreed to a Settlement Agreement with Defendant Jiffy Lube International, Inc. ("Jiffy Lube"). On September 15, 2023, I preliminarily certified the Settlement Class and preliminarily approved the Settlement Agreement. Plaintiff now moves for class certification and final approval of the Settlement. Additionally, Plaintiff moves for attorneys' fees, reimbursement of expenses, and a service award to Plaintiff Fuentes.

The Settlement Agreement proposes a $2 million all-cash settlement fund that, after subtraction of attorney costs and Fuentes' service award, would be distributed to approximately 1,255 class members. Pl.'s Br. in Supp. of Mot. for Final Approval of Settlement and Award of Att'y's Fees, Expenses, and Service Award ("Pl.'s Final Approval Br."), ECF No. 175-1, at 8, 8 n.2, 9. The putative class members were notified of the proposed settlement, and no individuals opted out or filed objections to the Settlement Agreement. Pl.'s Reply Br. in Supp. of Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Pl.'s Final Approval Reply Br."), ECF No. 177, at 1. On May 8, 2024, the Court held a final fairness hearing. For the below reasons, I will grant Plaintiff's motion for class certification and final

approval of the Settlement. I will also grant Plaintiff's motion for attorneys' fees, reimbursement of expenses, and service award to the class representative.

## I. BACKGROUND

Defendant Jiffy Lube has more than 2,000 locations across the country that provide lubrication, oil change, and light repair services for cars and light trucks. Second Amended Compl., ECF No. 91, at ¶ 2, 11. These shops are Jiffy Lube franchises, which are independently owned and operated. *Id.* at ¶ 11. Jiffy Lube enters into a contractual franchise agreement with the owner of each franchised shop. *Id.* These franchise agreements allow the business operator (franchisee) to operate a licensed Jiffy Lube shop in return for a fee and agreement to other terms. *Id.* at ¶ 18. From an unknown date until at least March 30, 2016, Jiffy Lube included a term in its standard franchise agreement that prohibited franchisees from soliciting or hiring existing employees of Jiffy Lube shops (the "no-poach" clause). *Id.* at ¶ 23. The "no-poach" clause read as follows:

> Franchisee covenants that during the term of this Agreement, Frachisee will not employ or seek to employ any person who is or within the preceding six months has been an employee of Franchisor or of any System franchisee of Franchisor, either directly or indirectly, for itself or through, on behalf of, or in conjunction with any person.

*Id.* If a franchisee failed to comply with this or any other term of the franchise agreement, Jiffy Lube could terminate their franchise. *Id.* at ¶ 24.

Plaintiff alleges that the "no-poach" clause had the effect of benefitting Jiffy Lube franchise shop owners at the expense of employees and consumers. *Id.* at ¶¶ 27, 31. Plaintiff further alleges that the "no-poach" clause allowed Jiffy Lube locations to retain employees at below-market wages, without attractive benefits, working conditions, or opportunities for advancement. *Id.* at ¶¶ 32, 35. According to Plaintiff, Jiffy Lube's "no-poach" clause constituted unfair competition and collusion in violation of antitrust. *Id.* at ¶¶ 40, 51, 88.

On November 29, 2018, former Jiffy Lube franchisee employee Victor Fuentes filed a complaint under the Sherman Act against Jiffy Lube. Compl., ECF No. 1. He sought to represent a nationwide class of former Jiffy Lube franchisee employees who allegedly had their wages depressed as a result of the "no-poach" provisions contained in Jiffy Lube's franchise agreements. *Id.* On April 15, 2019, Jiffy Lube moved to dismiss Fuentes' complaint for failure to state a claim. ECF No. 11. On May 1, 2019, Jiffy Lube moved to transfer venue to the Southern District of Texas. ECF No. 24. On November 25, 2019, I denied Jiffy Lube's motion to dismiss to the extent it argued that Plaintiff failed to state a claim under the Sherman Act. Explanation and Order, ECF No. 41, at 6. I granted the motion to dismiss as to Fuentes' claim for injunctive relief and his claims falling outside the four-year statute of limitations. *Id.* On December 20, 2019, I denied Jiffy Lube's motion to transfer venue. Explanation and Order, ECF No. 45, at 10.

On May 4, 2020, Plaintiffs[1] filed an amended complaint. ECF No. 53. Jiffy Lube once again moved to dismiss the complaint, which was then resolved by stipulation. ECF Nos. 54, 57. The parties engaged in discovery and requested multiple extensions of the discovery deadlines due to COVID-19 delays and the high volume of discovery in this case. ECF Nos. 61, 72, 74. By March 15, 2021, Jiffy Lube had produced more than 920,000 pages in discovery. Notice, ECF No. 72, at 1. Plaintiffs took six depositions, including a deposition of three corporate Jiffy Lube designees, four Jiffy Lube employees, and a third party. Decl. of Joshua J. Bloomfield in Supp. of Pl.'s Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award ("Bloomfield Decl."), ECF No. 175-2, at ¶ 5. Plaintiff hired an econometric expert to analyze the data received from Jiffy Lube and to create a preliminary damages model to assess the economic

---

[1] Cayla Young participated in this lawsuit as a class representative from May 4, 2020 until July 25, 2022, when she was dismissed from the case by stipulation. First Amended Compl., ECF No. 53; Stipulation of Dismissal, ECF No. 92.

impact of the "no-poach" clause. *Id.* at ¶ 6. The parties held informal settlement discussions. *Id.* at ¶ 7. On October 13, 2021 and November 5, 2021, the parties engaged in settlement negotiations before Magistrate Judge David R. Strawbridge. ECF Nos. 80, 81. On February 22, 2022, Fuentes informed the Court that the parties had agreed in principle to a settlement of class claims on behalf of certain Jiffy Lube franchisee employees. Notice, ECF No. 84.

On July 22, 2022, Fuentes moved for preliminary approval of a settlement of class claims and preliminary certification of the settlement class. Motion, ECF No. 90. The proposed settlement class was narrower than the class described by Fuentes' original complaint. Instead of a nationwide class, the proposed settlement agreement encompassed only those employees who had worked at a Jiffy Lube franchise in the greater Philadelphia metropolitan area. Second Amended Compl., ECF No. 91.

On September 2, 2022, Oscar Jimenez moved to intervene as a class representative for a nationwide class and a California subclass. Motion to Intervene, ECF No. 94, at 1–2. Jimenez is a former employee of a Jiffy Lube franchisee in California, and his claims against Jiffy Lube would not be encompassed by Fuentes' proposed settlement. *Id.* at 4. On March 16, 2023, I permitted Jimenez to intervene in the suit. Order, ECF No. 117. On September 14, 2023, I compelled Jimenez to arbitrate his claims based on the existence of a binding arbitration agreement between Jimenez and the Jiffy Lube franchisee where he previously worked. Memorandum, ECF No. 153, at 10; Order, ECF No. 154.

On September 15, 2023, I preliminarily approved Fuentes' settlement of class claims and scheduled a final approval hearing. Order, ECF Nos. 155, 156. On September 21, 2023, Nathan Hernandez moved to intervene to replace Oscar Jimenez as a class representative for a nationwide class and a California subclass. ECF No. 157, at 3. On December 13, 2023, I denied Hernandez's

motion as untimely because of his lengthy delay in seeking intervention. Memorandum, ECF No. 170; Order, ECF No. 171. That same day, I issued a scheduling order setting forth deadlines for notice to the putative class members. ECF No. 172.

KCC Class Action Services, LLC ("KCC") is the Claims Administrator that managed the notice process. Decl. of Bernella Osterlund Re: Notice Procedures ("Osterlund Decl."), ECF No. 176-1, at ¶ 1. KCC received the names of the 1,255 identified putative class members and submitted court-approved notice packets to each of them. *Id.* at ¶¶ 3, 4. KCC verified and updated the address information of each putative class member. *Id.* at ¶¶ 2, 4. In five instances, notice packets were returned as undeliverable and KCC was unable to find a new address for the putative class member. *Id.* at ¶ 4. KCC established a website, email address, and toll-free telephone number to provide additional information about the settlement. *Id.* at ¶¶ 5, 6, 7. KCC did not receive any communications from putative class members seeking to dispute their calculated total earnings, opt out from the settlement, or object to the settlement. *Id.* ¶¶ 8, 9, 10.

On January 29, 2024, Fuentes moved for final approval of the settlement, and for the awarding of attorney's fees, expenses, and a service award. ECF No. 175. In April 2024, Fuentes filed additional briefing regarding the results of the notice and opt-out procedures. ECF Nos. 176, 177. On May 8, 2024, I held a final approval hearing.

## II. PROPOSED CLASS ACTION SETTLEMENT

### A. Proposed Settlement Class

The parties define the Settlement Class as follows:

All persons in the United States who between December 1, 2014 and December 31, 2018 (i) worked as hourly employees; (ii) of a Jiffy Lube Franchisee located in the Philadelphia-Camden-Wilmington MSA; and (iii) worked for a period of at least 90 days.

Settlement Agreement, ECF No. 90-3, at ¶ 1.33. Excluded from the Settlement Class are:

(a) Jiffy Lube and its principals, affiliated entities, legal representatives, successors, and assigns; (b) any Person who files a valid, timely Request for Exclusion; (c) federal, state, and local governments (including all agencies and subdivisions thereof); and (d) any Person who settled and released claims at issue in this Action.

Pl.'s Final Approval Br. at 1.[2]

**B. Proposed Settlement**

The proposed Settlement is a cash settlement. Settlement Agreement at ¶ 3.1. Defendant Jiffy Lube has already deposited $2 million into the escrow account to be used for the settlement distribution. Pl.'s Final Approval Br. at 2 n.5. After payment of settlement administration expenses, taxes, fee and expense awards, and the class representative's service award, the remaining portion of the settlement would be paid to the class members. Settlement Agreement at ¶ 8.3. These payments would be allocated pro rata based on the estimated amounts that the class members earned at a Jiffy Lube franchisee during the Settlement Class Period. Ex. 2, Allocation Plan for Jiffy Lube Settlement, ECF No. 175-4, at 1 (referenced in Settlement Agreement at ¶ 8.5). Class members would be paid automatically, without needing to submit a claim form. *Id.* One-third of the settlement payment to each class member would be considered taxable wages, and the Settlement Administrator would withhold tax and pay payroll tax for that portion of the class member's payment. *Id.* The remaining two-thirds of the payment would not be subject to withholding. *Id.* If the pro rata settlement amount due to any class member were $50 or less, that amount would be all be considered non-wages. *Id.*

If there were unclaimed funds after the initial distribution (e.g., if some checks were returned as undeliverable), Jiffy Lube would not have a reversionary interest in the remaining amount. Settlement Agreement at ¶ 8.7. A second pro rata distribution would be sent to class

---

[2] This exclusion provision was incorporated into the Settlement Agreement orally by party stipulation on the record at the Final Approval Hearing on May 8, 2024.

members if there were sufficient funds remaining to make this economically sensible. *Id.* If not, the remaining undistributed amount would be donated on a cy-près basis to a Court-approved nonprofit organization. *Id.*

## III. DISCUSSION

### A. Class Certification

Plaintiffs move for certification of the Settlement Class pursuant to Rule 23(b)(3). For a class action to have preclusive effect and bind absent class members, a class must first be certified. Federal Rule of Civil Procedure 23(a) contains four threshold requirements for certification:

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b)(3) imposes two additional requirements: "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Rule 23(b)(3) requirements are commonly referred to as predominance and superiority. *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 296 (3d Cir. 2011) (en banc). In addition to these two explicit requirements, Rule 23(b)(3) also imposes an implicit ascertainability requirement. *Byrd v. Aaron's Inc.*, 784 F.3d 154, 161–62 (3d Cir. 2015).

"[T]he party proposing class-action certification bears the burden of affirmatively demonstrating by a preponderance of the evidence her compliance with the requirements of Rule 23." *Byrd*, 784 F.3d at 163. Class certification "demand[s] undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997). However, the existence of a settlement means that "certain Rule 23 considerations . . . are not applicable."

*Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 378 (3d Cir. 2013). For example, because a settlement obviates the need for trial, concerns regarding the manageability of a Rule 23(b)(3) class disappear. *See Amchem*, 521 U.S. at 620; *see also Sullivan*, 667 F.3d at 297 (noting that "concerns regarding variations in state law largely dissipate when a court is considering the certification of a settlement class"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 529 (3d Cir. 2004) ("[C]oncerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class" (citing *Amchem*, 521 U.S. at 620)).

The proposed Class meets the Rule 23(a) and 23(b)(3) requirements and warrants certification.

### 1. Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No minimum number of plaintiffs is required to maintain a suit as a class action, but generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met." *Stewart v. Abraham*, 275 F.3d 220, 226–27 (3d Cir. 2001). The parties represent that there are approximately 1,255 putative class members. Accordingly, Plaintiff satisfies the numerosity requirement of Rule 23(a).

#### b. Commonality

Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy commonality, class members' claims "must depend upon a common contention . . . of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one

of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Commonality may be shown by "demonstrat[ing] that the class members 'have suffered the same

injury.'" *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). A single common

question or fact is sufficient to satisfy the commonality requirement of Rule 23(a)(2). *Wal-Mart*,

564 U.S. at 359; *Kanter ex rel. Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994).

Here, common questions of law and fact include:

a. Whether Jiffy Lube engaged in unlawful contracts, combinations, and/or conspiracies in restraint of trade and commerce and in violation of the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.*;
b. Whether such agreements had an antitrust impact in suppressing wages below competitive levels;
c. Whether Plaintiff and Settlement Class Members are entitled to damages;
d. The amount of any damages.

Pl.'s Final Approval Br. at 19–20. Effectively, Plaintiffs allege the same harm from the same

conduct: the suppression of wages below competitive levels because of a "no-poach" agreement

between Jiffy Lube and its franchisees. All the putative class members' claims depend on common

questions of law and fact: whether this agreement constituted a violation of the Sherman Antitrust

Act, and the extent of the agreement's effect on wages. The commonality requirement is satisfied.

### c. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality inquiry asks

"whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus

suggesting that the incentives of the plaintiffs are aligned with those of the class." *Beck v.*

*Maximus, Inc.*, 457 F.3d 291, 295–96 (3d Cir. 2006) (quoting *Baby Neal*, 43 F.3d at 55).

The Third Circuit has "set a low threshold for satisfying" the typicality requirement.

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 183 (3d Cir. 2001). The

typicality requirement "acts as a bar to class certification only when 'the legal theories of the named representatives potentially conflict with those of the absentees.'" *Id.* (quoting *Georgine v. Amchem Prod., Inc.*, 83 F.3d 610, 631 (3d Cir. 1996), *aff'd sub nom.*, *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997)). "If the claims of the named plaintiffs and putative class members involve the same conduct by the defendant, typicality is established regardless of factual differences." *Newton*, 259 F.3d at 183–84.

Plaintiff Fuentes alleges that he and all putative class members suffered economic damages from Jiffy Lube's implementation of a "no-poach" agreement. Specifically, Fuentes alleges that the agreement artificially depressed wages by preventing Jiffy Lube franchisee employees from seeking employment at other Jiffy Lube locations. Fuentes was an employee at a Jiffy Lube franchisee store during the time the "no-poach" agreement was in effect. The putative class encompasses those, like him, who were employed during the time that this agreement existed. The typicality requirement is satisfied because the claims of the named Plaintiff and the putative class members involve the same agreement promulgated by Jiffy Lube, the same alleged injury, and the same claim for relief.

### d. Adequacy of Representation

The final prong of Rule 23(a) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem*, 521 U.S. at 625. The adequacy of representation requirement addresses two components: (1) the qualifications of class counsel; and (2) the interests and incentives of the class representatives. *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 181 (3d Cir. 2012).

### i. Adequacy of Class Counsel

When examining settlement classes, courts "have emphasized the special need to assure that class counsel: (1) possessed adequate experience; (2) vigorously prosecuted the action; and (3) acted at arm's length from the defendant." [3] *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995).

Gibbs Law Group is Class Counsel, as it is defined in the Settlement Agreement. Settlement Agreement at ¶ 1.3. [4] Joshua J. Bloomfield, the Gibbs attorney who has been the primary litigator in the later stages of this case, [5] has been involved in this litigation since its inception. Mr. Bloomfield is an experienced attorney who has previously litigated complex class action claims. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5, at 24.

Class Counsel has vigorously prosecuted the claims of the Philadelphia-area class claimants who are encompassed by the Settlement Agreement. This case has demanded substantial time and energy from Class Counsel: there have been two motions to dismiss and significant discovery, as well as multiple settlement conferences. Developing precedent in other circuits has, at times, called into question certain aspects of the class claims. *See* Pl.'s Br. in Support of Uncontested Mot. for Prelim. Approval of Settlement and for Certification of the Proposed Settlement Class, ECF No. 90-1, at 6 (expressing concern about the viability of certifying a nationwide class action) (citing *Deslandes v. McDonald's USA, LLC*, No 17 C 4857, 2021 WL

---

[3] In 2003, Congress amended Rule 23 to include subdivision 23(g), which provides a non-exhaustive list of factors for a court to consider when scrutinizing the adequacy of class counsel's representation. *See* Fed R. Civ. P. 23(g). The addition was meant to transfer the analysis of class counsel's representation from Rule 23(a)(4), where it had little textual support, to Rule 23(g). *See* 1 William B. Rubenstein, Newberg on Class Actions § 3.80 (5th ed.). Rule 23(g) "builds on" the existing 23(a)(4) jurisprudence instead of "introducing an entirely new element into the class certification process." *See* Fed. R. Civ. P. 23(g) advisory committee's notes (2003 amendments). Accordingly, the Third Circuit continues to apply the factors relied on prior to the addition of Rule 23(g). *See In re Cmty. Bank of N. Va.*, 622 F.3d 275, 304-05 (3d Cir. 2010); *In re Cmty. Bank of N. Va.*, 418 F.3d 277, 307 (3d Cir. 2005). Class Counsel's representation of the Class satisfies both Rule 23(a)(4) and 23(g).

[4] Two other law firms have been involved on the plaintiff's side of this litigation: Paul LLP and Morgan & Morgan.

[5] The two other Gibbs Law Group attorneys listed on ECF, Michael L. Schrag and George W. Sampson, do not appear to still be affiliated with the firm. *See* Ex. 3, Gibbs Law Group Firm Resume, ECF No. 175-5.

3187668, at *11 (N.D. Ill. July 28, 2021) (declining to certify nationwide Sherman Act class action case)). Since the inception of this case, Class Counsel has advanced attorney time and litigation expenses without a guaranteed recovery.

Moreover, Class Counsel has prosecuted this case at arm's length from Jiffy Lube. They have engaged in adversarial motions practice, and the negotiations that resulted in the proposed Settlement Agreement took place in formal settlement conferences before Magistrate Judge Strawbridge.

Accordingly, Mr. Bloomfield and his colleagues have adequately represented the putative class.

### ii. Adequacy of Class Representatives

 "A class representative must be part of the class and 'possess the same interest and suffer the same injury' as the class members." *Amchem*, 521 U.S. at 625–26 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). "[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." *Dewey*, 681 F.3d at 183. The purpose of the adequacy requirement is to identify intra-class conflicts that may prevent the representative plaintiff from adequately representing the entire class. *Id.* at 183–4. A court must address two questions to determine whether the representative plaintiff adequately represents the putative class: "(1) whether an intra-class conflict exists; and if so, (2) whether that conflict is 'fundamental.'" *Id.* at 184.

Plaintiff Victor Fuentes has diligently represented the Settlement Class. He has participated in discovery and made himself available during settlement conferences. Like the class members he seeks to represent, Fuentes is a former Philadelphia-area Jiffy Lube franchisee employee who was allegedly harmed by Jiffy Lube's "no-poach" provision. There does not appear to be any intra-

class conflict between Fuentes and the other members of the Settlement Class. This conclusion is further bolstered by the lack of objections from the 1,255 individuals who were notified about their potential class membership.

### 2. Rule 23(b)(3) Requirements

#### a. Predominance

Under Rule 23(b)(3), an opt-out class may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," *Amchem*, 521 U.S. at 623, and to determine whether the proposed class "would achieve economies of time, effort, and expense[.]" *Id.* at 615 (internal quotation marks omitted) (quoting Advisory Committee's Notes on Fed R. Civ. P. 23(b)(3) (1966 amendments)). The predominance inquiry is a more stringent version of the commonality analysis; common questions must drive the litigation. *See Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[T]he commonality requirement 'is subsumed by the predominance requirement.'" (quoting *Georgine*, 83 F.3d at 627)); *Warfarin*, 391 F.3d at 528 (noting the predominance requirement to be "far more demanding" than the commonality requirement).

"[T]he focus of the predominance inquiry is on whether the defendant's conduct was common as to all of the class members, and whether all of the class members were harmed by the defendant's conduct." *Sullivan*, 667 F.3d at 298. Although it is sometimes necessary to determine whether the elements of each claim can be proved through evidence common to the class, a settlement "obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws," *Id.*, 667 F.3d at 304, 306. Additionally, because

certification of a settlement class is sought, a court is "not as concerned with formulat[ing] some prediction as to how [an] element of a Sherman Act violation would play out at trial, for the proposal is that there be no trial." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (citations and internal quotation marks omitted).

Here, the allegation is that Jiffy Lube engaged in a common course of conduct that pertained to all franchisees covered by the Settlement Agreement. The "no-poach" provision applied to every franchise agreement equally. The issue of whether this provision suppressed wages in violation of antitrust law is common to all putative class members. The injury to each franchisee employee is also a common question: if Jiffy Lube's use of the "no-poach" provision lowered wages at all its locations in the Philadelphia area, all the franchisee employees would claim the same injury. The same issues, requiring the same expertise and the same proof, apply to each of the putative class members, predominating over any individual differences between the individual members. Accordingly, Plaintiff satisfies the predominance requirement.

### b. Superiority

Rule 23(b)(3) requires "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "The superiority requirement 'asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those alternative available methods of adjudication.'" *Warfarin*, 391 F.3d at 533–34 (quoting *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 316 (3d Cir. 1998)). In determining whether a settlement class action is superior, a court "consider[s] the class members' interests in individually controlling litigation, the extent and nature of any litigation, the desirability or undesirability of concentrating the litigation, and the likely difficulties

in managing a class action." *In re Nat'l Football League Players Concussion Injury Litig.*, 821

F.3d 410, 434–35 (3d Cir. 2016) (citing Fed. R. Civ. P. 23(b)(3)(A)–(D)).

The parties have identified 1,255 putative class members. Individual putative class

members may "have little interest in 'individually controlling the prosecution or defense of

separate actions' because each [individual] has a very small claim in relation to the cost of

prosecuting a lawsuit." *Warfarin*, 391 F.3d at 534 (quoting Fed. R. Civ. P. 23(b)(3)(A)) (in the

context of consumer class actions). These costs can be especially burdensome in an antitrust

lawsuit. The parties have not represented that any putative class member has commenced litigation

on an individual basis. This indicates a lack of interest in individually bringing claims. *See*

*Warfarin*, 391 F.3d at 534. None of the putative class members have opted out of the settlement

or objected to it. This is unsurprising: the prospect of litigating an individual antitrust case for a

low payout is economically unfeasible. If I credit the plaintiff's expert's assertion that a $2 million

settlement represents 90% of the putative class members' damages, a successful individual claim

would result in a payout of under $2,000. The mechanism of the class action allows litigation

expenses to be shared among class members to avoid the time and expense of litigating hundreds

of individual claims. Accordingly, Plaintiff satisfies the superiority requirement.

### c. Ascertainability

Rule 23(b)(3)'s implicit ascertainability requirement requires the plaintiff to show that: "1)

the class is "defined with reference to objective criteria"; and (2) there is "a reliable and

administratively feasible mechanism for determining whether putative class members fall within

the class definition." *Byrd v. Aaron's Inc.*, 784 F.3d 154 (3d Cir. 2015) (internal quotation marks

omitted). Here, the parties have identified 1,255 putative class members by reference to Jiffy

Lube's employment records. These records identify the employment dates and locations of these

former employees, and reliably indicate which individuals fall within the class definition. The proposed class is ascertainable.

In conclusion, I will certify the Settlement Class because the Settlement Class satisfies the requirements of Rule 23(a) and 23(b)(3).

## B. Final Approval of the Settlement

Plaintiffs move for final approval of the Settlement Agreement. Under Federal Rule of Civil Procedure 23(e)(2), a court may approve the settlement of a class action "only on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The Third Circuit has "identified two opposing interests a district court must weigh when reviewing motions for settlement-only class certification and approval of the settlement." *In re: Google Inc. Cookie Placement Consumer Privacy Litig.*, 934 F.3d 316, 326 (3d Cir. 2019).

The first competing interest is to "favor the parties reaching an amicable agreement and avoiding protracted litigation." *Id.* This is because these complex actions "consume substantial judicial resources and present unusually large risks for the litigants." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 805 (3d Cir. 1995). Therefore, when evaluating a settlement, a court should be "hesitant to undo an agreement that has resolved a hard-fought, multi-year litigation." *In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 175 (3d Cir. 2013) (citing *Warfarin*, 391 F.3d at 535). "Settlements are private contracts reflecting negotiated compromises. The role of a district court is not to determine whether the settlement is the fairest possible resolution—a task particularly ill-advised given that the likelihood of success at trial (on which all settlements are based) can only be estimated imperfectly." *Id.* at 173–74 (citation omitted). A court must recognize that a settlement is a "yielding of the highest hopes in exchange for certainty and resolution" and "guard against demanding too large a settlement based on its view

of the merits." *In re General Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d at 806.

"At the same time, a district court has an obligation as a fiduciary for absent class members to examine the proposed settlement with care." *Google*, 934 F.3d at 326. This role requires special rigor "where settlement negotiations precede class certification, and approval for settlement and certification are sought simultaneously." *Warfarin*, 391 F.3d at 534; *see Google*, 934 F.3d at 326. "[A] district court's scrupulous review of the settlement terms is designed to ensure that class counsel has demonstrated sustained advocacy throughout the course of the proceedings and has protected the interests of all class members." *Google*, 934 F.3d at 326 (internal quotation marks omitted).

With these competing interests in mind, it is important to determine whether a presumption of fairness applies to the Settlement Agreement, but even more crucial to scrupulously review whether the Settlement is fair, reasonable, and adequate.

### 1. Presumption of Fairness

The Third Circuit applies an initial presumption of fairness if "'(1) the negotiations occurred at arms length; (2) there was sufficient discovery; (3) the proponents of the settlement are experienced in similar litigation; and (4) only a small fraction of the class objected.'" *Google*, 934 F.3d at 326 (quoting *NFL Concussion Litig.*, 821 F.3d at 436).

The parties participated in multiple formal settlement negotiations that occurred at arm's length before Magistrate Judge Strawbridge. Prior to beginning formal negotiations, Class Counsel engaged in discovery, including document discovery, depositions, and consultation with experts. During their negotiations, Class Counsel assessed the relative strengths of their case and ultimately abandoned their nationwide class claim in favor of reaching a more limited settlement for the

Philadelphia area. By the time the parties reached their proposed Settlement Agreement, they had litigated several issues through two motions to dismiss and had adequately assessed the strength of the class claims. Class Counsel has substantial experience in similar complex litigation, and defense counsel is similarly experienced.[6] Finally, there have been no objections lodged to the settlement, and that no individual putative class members have opted out. Therefore, the presumption of fairness applies.

### 2. Factors to Consider in Evaluating the Settlement

For a class action settlement, "[d]istrict courts are to assess the fairness, reasonableness, and adequacy . . . under Rule 23(e)(2) . . . applying the *Girsh* factors; applying the *Prudential* factors where applicable; and considering 'the degree of direct benefit provided to the class.'" *Google*, 934 F.3d at 329 (quoting *Baby Prods.*, 708 F.3d at 174).[7] Here, the *Girsh* factors, relevant

---

[6] Jiffy Lube is represented by Andrea L. D'Ambra, Anne M. Rodgers, Eliot Fielding Turner, and Layne E. Kruse of Norton Rose Fulbright US LLP. Each of these attorneys is of counsel or a partner at the firm, with substantial experience in antitrust litigation, discovery and data, and/or class action litigation. *See* Norton Rose Fulbright People Search, available at https://www.nortonrosefulbright.com/en-us/people.

[7] Effective December 1, 2018, Rule 23(e)(2) was amended to include the following considerations to guide a court's determination of the fairness, reasonableness, and adequacy of a settlement, whether:

    (A) the class representatives and class counsel have adequately represented the class;

    (B) the proposal was negotiated at arm's length;

    (C) the relief provided for the class is adequate, taking into account:

        (i) the costs, risks, and delay of trial and appeal;

        (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

        (iii) the terms of any proposed award of attorney's fees, including timing of payment; and

        (iv) any agreement required to be identified under Rule 23(e)(3); and

    (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). The Advisory Committee Notes recognize that prior to the addition in Rule 23(e)(2) of these explicit factors to consider, circuit courts had developed their own lists of factors to determine whether a settlement was fair, reasonable, and adequate. Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments). Moreover, the Advisory Committee Notes explain: "The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Id.* Notwithstanding the amendment of Rule 23(e)(2), the Third Circuit continues to advise district courts to assess the fairness, reasonableness, and adequacy of a settlement applying the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration. *See Google*, 934 F.3d at 329. Following this guidance from the Third Circuit, this Court will apply the *Girsh* factors, the relevant *Prudential* considerations, and the *Baby Products* direct benefit consideration to determine whether to approve the Settlement, with the understanding that these factors and considerations amply address "the

*Prudential* considerations, and *Baby Products* analysis overall weigh in favor of approval of the Settlement.

### a. The *Girsh* Factors

In *Girsh v. Jepson,* The Third Circuit directed district courts to consider the following nine factors:

> (1) the complexity, expense and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) (internal quotation marks and ellipses omitted).

### i. The Complexity, Expense, and Likely Duration of the Litigation

This factor "captures the probable costs, in both time and money, of continued litigation." *Warfarin*, 391 F.3d at 535–36 (quoting *In re Cendant Corp. Litig.*, 264 F.3d 201, 233 (3d Cir. 2001)). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *5 (E.D. Pa. Jan. 3, 2008) ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard Antitrust Litig.*, 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (internal quotation marks omitted).

If litigation continues in this antitrust class action, the parties may have to engage in additional discovery, extensive pretrial motions addressing complex factual and legal questions,

---

core concerns and procedure and substance" listed in the amended Rule 23(e)(2). Fed. R. Civ. P. 23(e)(2) advisory committee's notes (2018 amendments).

and ultimately a lengthy and complicated trial involving several experts. This case has already been pending for over five years, and continued litigation could mean that any recovery for the class members would take several more years. The complexity, expense, and likely duration of this antitrust class action weigh heavily in favor of approving the Settlement.

### ii. The Reaction of the Class to the Settlement

"The second *Girsh* factor 'attempts to gauge whether members of the class support the settlement.'" *Warfarin*, 391 F.3d at 536 (quoting *Prudential*, 148 F.3d at 318). In order to gauge class members' reactions, I first determine whether the class was appropriately notified of the settlement. To satisfy due process, notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *NFL Concussion Litig.*, 821 F.3d at 435. The notice in this case included detailed information, available in English and Spanish, that addressed each of the notice requirements in Fed. R. Civ. P. 23(c)(2)(B):

> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

*See generally* Notice, Ex. A, ECF No. 161-1. The notice was in plain language and described the nature of the settlement and the class member's rights in a Question-and-Answer format. It also provided three means by which the class members could obtain more information: a website, an email address, and a toll-free number. ECF No. 161-1, at 6. On February 21, 2024, KCC Class Action Services, LLC mailed the notice packet to the newest available addresses of all 1,255 identified class members. Osterlund Decl. at ¶ 3. Class Counsel and the Court received no

objections or opt outs from the Settlement Agreement, and there were no disputes filed as to the total estimated amount earned at a Jiffy Lube franchisee. Final Approval Hearing, ECF No. 178. Some class members inputted their Social Security numbers on the website, confirming that they did receive notice of the Settlement Agreement. *Id.*

No class member has voiced any objection or concern regarding the proposed settlement, and it appears that the notice procedures adequately advised the class members about the Settlement Agreement. The reaction of the Class weighs in favor of approving the Settlement.

### iii. The Stage of the Proceedings and the Amount of Discovery Completed

"The third *Girsh* factor captures the degree of case development that class counsel [had] accomplished prior to settlement. Through this lens, courts can determine whether counsel had an adequate appreciation of the merits of the case before negotiating." *NFL Concussion Litig.*, 821 F.3d at 438–39 (quoting *Warfarin*, 391 F.3d at 537). "[F]ormal discovery is not a requirement for the third Girsh factor. What matters is not the amount or type of discovery class counsel pursued, but whether they had developed enough information about the case to appreciate sufficiently the value of the claims." *Id.* at 439.

Here, Class Counsel engaged in sufficient discovery to adequately appreciate the merits of the case before negotiating. Class Counsel briefed two motions to dismiss and engaged in fact discovery and depositions. They also consulted with an expert regarding the effects that the "no-poach" provision may have had on wages. By the time the parties reached the Settlement Agreement, Class Counsel had a strong grasp of the legal hurdles that different permutations of the class could face, including the risk that a national class might not be certified. Therefore, this factor weighs in favor of approving the Settlement.

### iv. The Risks of Establishing Liability and Damages

"The fourth and fifth *Girsh* factors survey the possible risks of litigation in order to balance the likelihood of success and the potential damage award if the case were taken to trial against the benefits of an immediate settlement." *NFL Concussion Litig.*, 821 F.3d at 439 (quoting *Prudential*, 148 F.3d at 319).

Plaintiffs face some risks if they sought to continue litigating this action. Most notably, the viability of a nationwide class has been called into question by similar cases in districts outside of the Third Circuit. Class Counsel summarized this concern in their briefing:

> District court rulings in the substantially similar no-poach cases against Jimmy Johns and McDonald's enhanced the risk of obtaining class certification and proving liability. In both cases, the district court denied class certification and relied on the Supreme Court's *Alston* decision to hold that rule of reason analysis applies in no-poach actions brought by franchisee employees. *Conrad v. Jimmy John's Franchise, LLC*, No. 18-CV-00133-NJR, 2021 WL 3268339, at *10; *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2021 WL 3187668, at *7. In *Deslandes*, the district court also granted judgment on the pleadings in favor of McDonalds. *Deslandes v. McDonald's USA, LLC*, No. 17 C 4857, 2022 WL 2316187, at *4–5 (N.D. Ill. June 28, 2022).
>
> After this Court granted preliminary approval, the Seventh Circuit reviewed the *McDonalds* decision, reversed the dismissal, and remanded the case to the district court, *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023), finding the nopoach restriction was alleged to be horizontal and thus the per se rule could apply. While Plaintiff believes the *Deslandes* appellate court decision is correct, the Third Circuit has not affirmatively applied the per se rule in this context and thus there remains a real risk that liability is uncertain because unlike per se or quick look analysis, rule of reason is a more complex analysis and is far less favorable to an antitrust plaintiff.

Pl.'s Final Approval Br. at 16–17. Even if this Court established regional subclasses, as requested by the California intervenor Jimenez (and would-be intervenor Hernandez), such subclasses would likely require additional time and spending by Class Counsel to assess economic impacts in different markets.

Moreover, damages would not be guaranteed for the current class members or for the broader original nationwide class. Both Plaintiff and Defendant would likely call experts to dispute

whether (and if so, to what extent) the "no-poach" class in Jiffy Lube's franchise agreement caused low wages in violation of antitrust law. A jury could favor either expert's narrative, and the class members encompassed by this proposed Settlement Agreement might receive little to no benefit. *See Cendant*, 264 F.3d at 239 (contemplating that a jury could believe either of two competing experts).

Accordingly, the Settlement avoids the many significant hurdles that the Plaintiff would have encountered in establishing liability and damages. Therefore, the fourth and fifth *Girsh* factors weigh in favor of approving the Settlement.

### v. The Risks of Maintaining the Class Action Through the Trial

This factor "measures the likelihood of obtaining and keeping a class certification if the action were to proceed to trial." *Warfarin*, 391 F.3d at 537. Because class certification is subject to review and modification at any time during the litigation, the uncertainty of maintaining class certification favors settlement. *See Zenith Labs., Inc. v. Carter-Wallace, Inc.*, 530 F.2d 508, 512 (3d Cir. 1976) (affirming decision of the district court to reconsider and deny previously-approved class certification). "In a settlement class, this factor becomes essentially toothless because a district court need not inquire whether the case, if tried, would present intractable management problems[,] . . . for the proposal is that there be no trial." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted). Thus, this factor "deserve[s] only minimal consideration." *Id.*

Here, the Plaintiff faces real risks to obtaining and keeping class certification, particularly if the Plaintiff sought to reinstitute litigation on behalf of a nationwide class. Therefore, this factor weighs in favor of approving the Settlement.

### vi. The Ability of Defendants to Withstand a Greater Judgment

"The seventh *Girsh* factor considers 'whether the defendants could withstand a judgment for an amount significantly greater than the [s]ettlement.'" *Warfarin*, 391 F.3d at 537–38 (quoting *Cendant*, 264 F.3d at 240). "The seventh *Girsh* factor is most relevant when the defendant's professed inability to pay is used to justify the amount of the settlement." *NFL Concussion Litig.*, 821 F.3d at 440; *see also Warfarin*, 391 F.3d at 538 (finding no error with the district court's conclusion that "DuPont's ability to pay a higher amount was irrelevant to determining the fairness of the settlement"). "[I]n any class action against a large corporation, the defendant entity is likely to be able to withstand a more substantial judgment, and, against the weight of the remaining factors, this fact alone does not undermine the reasonableness of the . . . settlement." *NFL Concussion Litig.*, 821 F.3d at 440 (internal quotation marks omitted).

Plaintiffs concede that Jiffy Lube likely could withstand a greater judgment. Pl.'s Final Approval Br. at 17. This factor, however, does not undermine the reasonableness of the Settlement because Jiffy Lube has not tried to use any claimed inability to pay to avoid a higher settlement amount. The proposed settlement provides the class members with 90% of their damages, as estimated by Plaintiff's expert. *Id.* This factor is therefore neutral.

### vii. The Range of Reasonableness of the Settlement Fund in Light of the Best Possible Recovery and in Light of all the Attendant Risks of Litigation

"In evaluating the eighth and ninth *Girsh* factors, we ask 'whether the settlement represents a good value for a weak case or a poor value for a strong case.'" *Id.* (quoting *Warfarin*, 391 F.3d at 538). "The factors test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Warfarin*, 391 F.3d at 538. "[T]he present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the

amount of the proposed settlement." *NFL Concussion Litig.*, 821 F.3d at 440 (quoting *Prudential*, 148 F.3d at 322).

If the Plaintiff were to succeed at trial on his antitrust claim for the Settlement Class, he might recover slightly more than this settlement amount. However, the attorney fees and expenses would continue increasing, potentially negating any additional amount gained by going to trial. If the Plaintiff sought to litigate his original nationwide class action, he might recover much more, potentially tens of millions of dollars. The Plaintiff, however, would face the risk of additional lengthy and expensive litigation to try to certify that nationwide class. The Settlement Agreement here represents an excellent recovery for the Settlement Class, and an adequate overall recovery. Therefore, these factors weigh in favor of approving the Settlement.

### b. The *Prudential* Considerations

In *In re Prudential Insurance Co. America Sales Practice Litigation*, the Third Circuit expanded the analysis of factors to consider in evaluating a settlement to include what are now referred to as *Prudential* considerations:

> the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other facts that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; the existence and probable outcome of claims by other classes and subclasses; the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; whether class or subclass members are accorded the right to opt out of the settlement; whether any provisions for attorneys' fees are reasonable; and whether the procedure for processing individual claims under the settlement is fair and reasonable.

*Prudential*, 148 F.3d at 323. "Unlike the *Girsh* factors, each of which the district court must consider before approving a class settlement, the *Prudential* considerations are just that, prudential. They are permissive and non-exhaustive[.]" *Baby Prods.*, 708 F.3d at 174.

Here, Class Counsel was able to make an informed decision about the probable outcome of a trial. All Settlement Class Members had the opportunity to opt out of the Settlement. The procedure for processing individual claims under the settlement is fair and reasonable and does not require any action by individual class members.[8] Additionally, as discussed later in this memorandum, the provisions for attorneys' fees are reasonable. Therefore, the relevant *Prudential* considerations weigh in favor of approving the Settlement.

### c. The Degree of Direct Benefit Provided to the Class

In *In re Baby Products Antitrust Litigation*, the Third Circuit articulated an additional consideration for evaluating a settlement—"the degree of direct benefit provided to the class." *Baby Prods.*, 708 F.3d at 174. The Third Circuit explained:

> In making this determination, a district court may consider, among other things, the number of individual awards compared to both the number of claims and the estimated number of class members, the size of the individual awards compared to claimants' estimated damages, and the claims process used to determine individual awards.

*Id.*

Here, the Settlement Agreement created a $2 million cash fund to be distributed among 1,255 class members. In order to inform the class members about the Settlement, Class Counsel engaged in a thorough notice process. Class Counsel and the Settlement Administrator used Jiffy Lube, U.S. Postal Service, and other records to ascertain the mailing addresses for the class members. Osterlund Decl. at ¶¶ 2, 4. As of April 1, 2024, addresses were still missing for only five of the class members. *Id.* at ¶ 4. Packets were mailed (and not returned as undeliverable) to the other 1,250 class members. *Id.* Additionally, the Settlement Administrator established a website, email address, and telephone number to provide more information about the settlement and to

---

[8] Class members may provide their Social Security numbers but are not required to do so in order to receive payments.

respond to class members' inquiries. *Id.* at ¶¶ 5–7. Some class members have provided their requested (but optional) Social Security number information, as stated on the record at the final approval hearing.

After subtraction of the requested attorney's fees and expenses, the settlement administration costs, and the lead plaintiff's award, the fund totals $1,106,403. The average remaining award, if divided among all the 1,255 class members, is $881.60. The lack of objections or opt-outs to the settlement confirms that this fund represents a substantial benefit to class members, despite the sizable deduction of expenses and fees from the overall fund.

Because the *Girsh* factors and *Prudential* considerations overwhelming weigh in favor of approving the Settlement, and the degree of direct benefit to the Class does not counsel against approving the Settlement, I will grant final approval of the Settlement.

### C. Attorneys' Fees and Reimbursement of Litigation Expenses

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "[A] thorough judicial review of fee applications is required in all class action settlements." *Prudential*, 148 F.3d at 333 (quoting *In re G.M.*, 55 F.3d at 819); *see also Baby Prods.*, 708 F.3d at 178–80.

Here, Class Counsel requests $500,000 in attorney's fees, $320,465 in litigation expenses, and $68,132 for settlement administration. Pl's Mot. for Final Approval of Settlement and Award of Attorney's Fees, Expenses, and Service Award, ECF No. 175, at ¶ 5. The Settlement Agreement provides that Class Counsel may apply to the Court for an award for the time and expenses associated with litigating this case, to be drawn from the Settlement Fund. Settlement Agreement at ¶ 9.2. Jiffy Lube itself is not directly liable for payment of attorney's fees and expenses; these amounts will be subtracted from the overall $2 million fund. *Id.* at ¶ 9.2, 9.5.

Courts generally use one of two methods for assessing attorneys' fee requests: the lodestar method or the percentage-of-recovery method. *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005), *as amended* (Feb. 25, 2005). The lodestar method is more commonly the starting point in statutory fee-shifting cases. *Id.* The percentage-of-recovery method, on the other hand, is "generally favored in common fund cases." *Id.* This case involves a common cash fund, and therefore the percentage-of-recovery method is appropriate. Although not "necessarily determinative," the use of the lodestar method of fee approval also provides a cross-check of a court's initial fee calculation under the percentage-of-recovery method. *Baby Prods.*, 708 F.3d at 179–80; *see also In re Rite Aid*, 396 F.3d at 300.

"Counsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." *In re Suboxone (Buprenorphine, Hydrochloride and Naloxone) Antitrust Litig.*, 13-MD-2445, 2024 WL 815503, at *18 (E.D. Pa. Feb. 27, 2024) (quoting *In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 108 (D.N.J. 2001)). Class Counsel's expense request is broken down as follows:

| Expense Category | Expense Amount |
|---|---|
| Copying (Internal) | $1,017 |
| Experts/Consultants | $265,343 |
| Litigation Support | $36,189 |
| Postage/Delivery | $110 |
| Research | $3,066 |
| Transcripts | $13,440 |
| Travel | $3,908 |
| **Total** | **$322,073** |

Bloomfield Decl. at ¶ 16. Class Counsel seeks reimbursement for $320,465 of the above expenses, as well as $68,132 for Gilardi & Co. LLC to administer the settlement. ¶ 8. These expenses total nearly 20% of the total settlement amount.

Because the percentage-of-recovery method and the lodestar cross-check demonstrate that the attorneys' fee and expense request is reasonable, I will approve Plaintiffs' request for $500,000 as an award of attorneys' fees. Because the incurred expenses were reasonably incurred in the prosecution of this action, I will also approve $320,465 for reimbursement of expenses, and $68,132 for settlement administration expenses.

**1. Percentage-of-Recovery Method**

In deciding what amount is a reasonable fee award under the percentage-of-recovery method, a district court must consider the following ten factors known as the *Gunter/Prudential* factors:

> (1) the size of the fund created and the number of beneficiaries, (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel, (3) the skill and efficiency of the attorneys involved, (4) the complexity and duration of the litigation, (5) the risk of nonpayment, (6) the amount of time devoted to the case by plaintiffs' counsel, (7) the awards in similar cases, (8) the value of benefits attributable to the efforts of class counsel relative to the efforts of other groups, such as government agencies conducting investigations, (9) the percentage fee that would have been negotiated had the case been subject to a private contingent fee arrangement at the time counsel was retained, and (10) any innovative terms of settlement.

*In re Diet Drugs*, 582 F.3d 524, 541 (3d Cir. 2009) (citations omitted).

 Importantly, however, before reaching any single *Gunter/Prudential* factor, a court "should begin by determining with reasonable accuracy the distribution of funds that will result from the claims process." *Baby Prods.*, 708 F.3d at 179. "Th[e] court should then, relying on the *Gunter/Prudential* factors and its experience, determine whether the level of distribution provided to the class by the settlement reflects a failure of class counsel to represent adequately the interests of the entire class." *Id.*

The Class consists of 1,255 current and former employees of Jiffy Lube franchisees in the Philadelphia area. The Settlement Agreement provides $2 million, less fees and expenses, to

allocate to each of these former employees on a pro rata basis depending on the amount of money each employee earned during the settlement period. There is no reversion, meaning that Jiffy Lube will not be reimbursed any amount of the $2 million if the initial fund distribution does not fully exhaust the settlement fund. In that case, a second distribution will be made or the funds will be donated to a nonprofit organization on a cy-près basis. Plaintiff's econometrics expert's initial analysis shows that the Settlement amount is approximately 90% of the Settlement Class's damages. Bloomfield Decl. at ¶ 11. This means that, after subtraction of the 25% attorney fee amount and the expenses from the Settlement Fund, each member of the Settlement Class will likely receive approximately half of their estimated damages. Although this is not an exceptional recovery given the size of the fee and expense amounts, an examination of the *Gunter/Prudential* factors demonstrates that this is an adequate recovery given the substantial litigation time and costs involved in this case.

### a. The Size of the Fund Created and the Number of Beneficiaries

As noted above, the Settlement Agreement creates a $2 million fund to be distributed to 1,255 class members after the subtraction of fees and expenses. The fund itself represents 90% of the damages of the class, according to Plaintiff's econometrics expert. Bloomfield Decl. at ¶ 11. Class Counsel reviewed hundreds of thousands of documents throughout the discovery process, took six depositions, and began preparation of expert reports. *Id.* at ¶¶ 5, 6. Class Counsel also successfully briefed two motions to dismiss. Class Counsel requests 25% of the fund as attorney's fees.

Because Class Counsel diligently prosecuted this case and adequately prioritized the direct benefit to the Class, this factor weighs in favor of approving Plaintiffs' fee request.

### b. The Presence or Absence of Substantial Objections by Members of the Class to the Settlement Terms and/or Fees Requested by Counsel

Out of 1,255 class members, no individuals opted out or objected to the Settlement. Moreover, no one objected to Class Counsel's requested attorney's fees and expense reimbursements. Because there have been no objections pertaining to attorneys' fees, this factor weighs in favor of approving Plaintiffs' fee request.

### c. The Skill and Efficiency of the Attorneys Involved

As previously discussed, Class Counsel has extensive knowledge of antitrust law and class action practice. Throughout the course of this litigation, Mr. Bloomfield, Mr. Schrag, and Mr. Sampson have identified relevant issues in the action and have successfully defended against two motions to dismiss. This factor weighs in favor of approving Plaintiffs' fee request.

### d. The Complexity and Duration of the Litigation

The factors which increase the complexity of a class action include: "complex and/or novel legal issues, extensive discovery, acrimonious litigation, and tens of thousands of hours spent on the case by class counsel." *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 741 (3d Cir. 2001). Antitrust class actions are particularly complex to litigate and therefore quite expensive. *See In re Auto. Refinishing*, 2008 WL 63269, at *5 ("This litigation, *like most antitrust cases*, has been exceedingly complex, expensive, and lengthy." (emphasis added)). "An antitrust class action is arguably the most complex action to prosecute." *In re Linerboard*, 296 F. Supp. 2d at 577 (internal quotation marks omitted).

This case involved complex antitrust litigation and novel issues about franchise model wage suppression. This case has been pending for over five years, during which time there has been substantial litigation within this case and developments across the country related to franchisee wage suppression issues. *See* Compl. at ¶ 6 (noting that many states' attorneys general

are investigating "no-poach" provisions in franchise agreements, and that at least 30 national chains had entered consent decrees to cease use of such provisions). This factor weighs in favor of approving Plaintiffs' fee request.

### e. The Risk of Nonpayment

In every class action in which class counsel brings a case on a contingency basis, there is some risk of nonpayment. There is effectively no risk of nonpayment at this point given that Jiffy Lube has already deposited the $2 million settlement payment into an escrow account. The Third Circuit has "never [directly] addressed whether courts must reconsider the risk of nonpayment as the action evolves." *In re Diet Drugs*, 582 F.3d at 543. In practice, however, it has evaluated the risk of nonpayment throughout the litigation. *See Sullivan*, 667 F.3d at 332 (assessing "risk of nonpayment throughout the litigation"). Until the parties reached a settlement agreement in this case, the Plaintiff had no guarantee of recovery of damages for the class, fees and expenses for Class Counsel, or an individual award for the class representative.

Because the risk of nonpayment changed throughout the course of this litigation, this factor weighs only mildly in favor of approving Plaintiffs' fee request.

### f. The Amount of Time Devoted to the Case by Plaintiffs' Counsel

Through January 29, 2024, Plaintiff's counsel had devoted 3,267 hours to this case.[9] Bloomfield Decl. at ¶ 15. Class Counsel has also advanced at least $322,073 in litigation expenses. *Id.* at ¶ 16. The time and money spent by Plaintiff's counsel was necessary for the prosecution of this case and its eventual settlement. Because Plaintiff's Counsel devoted significant resources to this case, this factor weighs in favor of approving Plaintiffs' fee request.

---

[9] 1,379 hours were spent by Class Counsel Gibbs Law Group, 523 hours were spent by Paul LLP, and 1,365 hours were spent by Gustafson Gluec PLLC. Bloomfield Decl. at ¶ 15.

### g. The Awards in Similar Cases

Class Counsel request a fee that is 25% of the entire fund. In this District, "fee awards generally range between nineteen and forty-five percent of the common fund." *McDonough v. Toys R Us, Inc.*, 80 F. Supp. 3d 626, 653 (E.D. Pa. 2015) (collecting cases); *see also In re Suboxone Antitrust Litig.*, 2024 WL 815503, at *16 (collecting cases). Moreover, "courts within this Circuit have typically awarded attorneys' fees of 30% to 35% of the recovery, plus expenses." *In re Ravisent Techs., Inc. Sec. Litig.*, No. 00-1014, 2005 WL 906361, at *11 (E.D. Pa. Apr. 18, 2005) (collecting cases). Plaintiffs' fee request falls within the range of fees that are typically approved in this district. This factor weighs in favor of approving Plaintiffs' fee request.

### h. The Value of Benefits Attributable to the Efforts of Class Counsel Relative to the Efforts of Other Groups, Such as Government Agencies Conducting Investigations

This factor contemplates whether Class Members benefitted from "the efforts of other groups, such as government agencies conducting investigations." *In re AT & T Corp.*, 455 F.3d 160, 165 (3d Cir. 2006). Class Members have benefitted from the actions of state attorneys general who investigated these "no-poach" provisions in franchisee agreements. *See* Katie Reilly and Natalie West, *Antitrust Enforcement Is Top of Mind for State Attorneys General*, Bloomberg Law, July 17, 2023 (noting that several companies using a franchise model settled with 14 state attorneys general to cease use of no-poach agreements, and that the Washington Attorney General had signed 155 such agreements). The United States Department of Justice is also involved in investigating the role and impact of "no-poach" agreements. *See* Letter, ECF No. 146 (stating interest of U.S. Department of Justice Antitrust Division in this litigation). However, as noted by Plaintiff, these government actions have typically been forward-looking, seeking to eliminate "no-poach" terms from franchise agreements to prevent the damage they allegedly cause to workers. Compl. at ¶ 7.

This class action litigation drew upon the work of government agencies, but the settlement addresses alleged harms not otherwise resolved by government action. This favor is therefore neutral.

### i. The Percentage Fee that Would have been Negotiated had the Case been Subject to a Private Contingent Fee Arrangement at the Time Counsel was Retained

Plaintiffs' percentage fee request of 25% of the $2 million fund is a slightly lower percentage than is typically negotiated in private contingency fee cases. *See In re Aetna Inc.*, MDL No. 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) ("[A]n award of thirty percent is in line with what is routinely privately negotiated in contingency fee tort litigation.); *In re Ikon Office Sols., Inc., Sec. Litig.*, 194 F.R.D. 166, 194 (E.D. Pa. 2000) ("[I]n private contingency fee cases . . . plaintiffs' counsel routinely negotiate agreements providing for between thirty and forty percent of any recovery."). Class Counsel states that their customary fee in individual cases is in the range of 33%. Pl.'s Final Approval Br. at 29. The expenses of litigating this case were substantial, and their deduction from the fund results in a payment of only about 55% of the fund to the class members. It is not clear what proportion of these expenses were necessary for litigation for this particular settlement class, or to what extent these expenses were attributable to the original litigation of the nationwide class action claim. This factor weighs slightly in favor of approving Plaintiffs' fee request.

### j. Any Innovative Terms of Settlement

In the absence of any innovative terms, this factor neither weighs in favor nor against the proposed fee request.

Overall, the *Gunter/Prudential* factors demonstrate that Plaintiffs' request for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses is reasonable.

## 2. Lodestar Method

After a district court applies the percentage-of-recovery method to determine whether a fee request is reasonable, it is sensible to also apply "an abridged lodestar analysis serving as a cross-check." *In re Rite Aid*, 396 F.3d at 305. But the lodestar cross-check "should not displace a district court's primary reliance on the percentage-of-recovery method." *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006). "The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting. The district courts may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid*, at 306–307 (footnote omitted).

"The lodestar award is calculated by multiplying the number of hours reasonably worked on a client's case by a reasonable hourly billing rate for such services based on the given geographical area, the nature of the services provided, and the experience of the attorneys." *Id.* at 305. "The crosscheck is performed by dividing the proposed fee award by the lodestar calculation, resulting in a lodestar multiplier." *In re AT & T*, 455 F.3d at 164. A negative lodestar multiplier "suggests that class counsel would not be overpaid for their services if compensated as requested, but it also suggests that counsel has a significant financial incentive to cut its losses and settle the lawsuits." *Baby Prods.*, 708 F.3d at 180 n.14.

Plaintiffs' counsel devoted at least 3,250 hours to this action, resulting in a lodestar award of $2,083,711 according to counsel's calculation. Pl.'s Final Approval Br. at 30. When Plaintiffs' fee request of $500,000 is divided by the lodestar award of $2,083,711, it results in a significant negative multiplier of .24. The negative multiplier suggests that Plaintiffs' fee request is reasonable.[10]

---

[10] Admittedly, Class Counsel had "a significant financial incentive to cut its losses and settle the lawsuits," *Baby Prods.*, 708 F.3d at 180 n.14. But, given that a much higher recovery would have been possible if they continued litigating on behalf of a nationwide class, I defer to the attorneys' assessment that such continued litigation was too risky to justify jeopardizing recovery for this settlement class.

Class Counsel also requests payment of expenses and charges incurred in connection with the prosecution of this litigation in the amount of $320,465,[11] as well as payment of $68,132 for settlement administration. Together, the expenses and settlement administration costs total nearly 20% of the overall fund.

"[T]here is no reason to reject the request for reimbursement of expenses that counsel have spent out of their own pockets in litigating an antitrust case." *In re Fasteners Antitrust Litig.*, Civil Action No. 08-md-1912, 2014 WL 296954, at *8 (E.D. Pa. Jan. 27, 2014) (cleaned up) (quoting *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2004 U.S. Dist. LEXIS 29162, at *35–36 (E.D. Pa. Oct. 13, 2004)). Courts in this district have permitted expense reimbursements of this magnitude and for similar types of expenses in cases involving higher settlement amounts. *See, e.g. Fasteners*, 2014 WL 296954, at *8 (reimbursing $337,667.72 in costs in the context of a $17.55 million settlement); *In re Flonase Antitrust Litig.*, 951 F. Supp.2d at 751 (approving reimbursement of economic expert fees, with total reimbursed expenses of over $2 million in context of $150 million settlement). While in hindsight, an expensive econometric analysis of the nationwide impact of Jiffy Lube's "no-poach" term is unnecessary to prove a case solely for Philadelphia-area class members, this was a reasonable expense at the time that Plaintiff's counsel was litigating a nationwide case. This expert report may also have been a useful tool in convincing Jiffy Lube to agree to a settlement for the regional class. Class Counsel's expenses, while high given the size of the eventual settlement, were reasonably incurred in prosecution of this case.

Because both the percentage-of-recovery method and the lodestar cross-check indicate that Plaintiffs' fee request is reasonable, I will approve Plaintiffs' request for $500,000 as an award of

---

[11] $265,343 is attributable to experts and consultants. Bloomfield Decl. at ¶ 16. $57,730 is attributable to copying, litigation support, postage, research, transcripts, and travel. *Id.*

attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses.

### D. Incentive Awards for Class Representatives

Plaintiffs' request an incentive award of $5,000 the named class representative, Victor Fuentes, for his contributions to the case. "Incentive awards, also known as 'enhancement awards' or 'service payments,' are common in class actions that result in a common fund for distribution to the class." *Altnor v. Preferred Freezer Servs., Inc.*, 197 F. Supp. 3d 746, 769 (E.D. Pa. 2016). "The purpose of these payments is to compensate named plaintiffs for the services they provided and the risks they incurred during the course of class action litigation, and to reward the public service of contributing to the enforcement of mandatory laws." *Sullivan*, 667 F.3d at 333 n.65 (internal quotation marks omitted).

Plaintiffs cite to several cases in which district courts in this circuit have awarded named plaintiffs $5,000 or more. Pl.'s Final Approval Br. at 32 (citing *Myers v. Jani-King of Philadelphia*, No. 09-1738, 2019 WL 4034736, at *10 (E.D. Pa. Aug. 26, 2019) ($10,000); *Caddick v. Tasty Baking Co.*, No. 2:19-CV-02106-JDW, 2021 WL 4989587, at *10 (E.D. Pa. Oct. 27, 2021) ($5,000); *Copley v. Evolution Well Services Operating, LLC*, No. 2:20-CV-01442-CCW, 2023 WL 1878581, at *4 (W.D. Pa. Feb. 10, 2023) ($10,000); *Baez-Medina v. Judge Group, Inc.*, No. 21-3534, 2023 WL 4633503, at *9 (E.D. Pa. July 20, 2023) ($5,000)). Fuentes was involved in this case since its inception in 2018. He has made himself available to participate in settlement conferences, and he has provided documentation related to his own employment at a Jiffy Lube franchisee. Because Victor Fuentes provided information necessary to Plaintiffs' counsel for filing the complaint and for negotiating this Settlement Agreement, I will approve Plaintiffs' request for an incentive award of $5,000 to Mr. Fuentes.

## IV. CONCLUSION

For the above reasons, I will grant Plaintiffs' motion for class certification and final approval of the Settlement. I will also grant Plaintiffs' motion for attorneys' fees, reimbursement of expenses, and incentive award to the class representative. Accordingly, I will approve Plaintiffs' requests for $500,000 as an award of attorneys' fees, $320,465 in litigation expenses, and $68,132 for settlement administration expenses. I will also approve Plaintiffs' request for an incentive award of $5,000 for the named class representative.

  s/ANITA B. BRODY, J.

ANITA B. BRODY, J.